IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Criminal Case No. 20-cr-00327-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  CHARLES RAMON, III,

     Defendant.

---

## ORDER

---

     This matter comes before the Court on Defendant's Renewed Motion for Judgment of Acquittal [Docket No. 101].  The government responded.  Docket No. 104.  On February 25, 2022, defendant filed a motion for leave to file a reply, with the proposed reply attached to the motion.  Docket No. 106.  The Court will grant the motion for leave and consider the arguments made by defendant in the reply.

## I. BACKGROUND

     A grand jury charged Mr. Ramon with violating 18 U.S.C. § 922(g)(1), possession of a firearm by a prohibited person.  Docket No. 1 at 1.  A trial began on January 10, 2022.  Docket No. 85.  After the government rested its case, Mr. Ramon made an oral motion for judgment of acquittal, which the Court took under advisement.  Docket No. 87 at 3.  Mr. Ramon also filed a motion for leave to file a brief in support of his arguments, Docket No. 88, which the Court granted.  Docket No. 90 at 1.  After the close of all the evidence, defendant renewed his motion for a judgment of acquittal.  *Id.* at 2.  The Court orally denied both the original and renewed motion.  *Id.*  On January

13, the jury returned a verdict of guilty.  Docket No. 96.  Defendant moved for an extension of time to file a motion under Rule 29 or 33, Docket No. 99, which the Court granted.  Docket No. 100.  On February 3, 2022, defendant filed a renewed motion for a judgment of acquittal under Rule 29.  Docket No. 101.

## II.  LEGAL STANDARD

### A.  Rule 29

Rule 29 states that a "defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  Fed. R. Crim. P. 29(c).  In evaluating a Rule 29 motion, a court "ask[s] if, 'viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Tennison*, 13 F.4th 1049, 1059 (10th Cir. 2021) (quoting *United States v. Cornelius*, 696 F.3d 1307, 1316 (10th Cir. 2012)).  The court "consider[s] both circumstantial and direct evidence, 'but [] do[es] not weigh the evidence or consider the credibility of witnesses.'"  *United States v. Otuonye*, 995 F.3d 1191, 1209 (10th Cir. 2021) (quoting *United States v. Isabella*, 918 F.3d 816, 830 (10th Cir. 2019)).  The court evaluates the sufficiency of the evidence by "considering the collective inferences to be drawn from the evidence as a whole," rather than examining the evidence in "bits and pieces."  *Tennison*, 13 F.4th at 1059 (quoting *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004)).  A court may enter a judgment of acquittal "only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (citation omitted).

2

**B.  18 U.S.C. § 922(g)(1)**

The jury in this case was instructed that, in order to find defendant guilty, it

must be convinced that the government has proved each of the following
elements beyond a reasonable doubt:

>        *First*: on or about March 13, 2019, the defendant knowingly
> possessed a firearm;
>        *Second*: the defendant was convicted of a felony, that is, a crime
> punishable by imprisonment for a term exceeding one year, before he
> possessed the firearm;
>        *Third:* at the time he possessed the firearm, the defendant knew he
> had previously been convicted of a felony, that is, a crime punishable by
> imprisonment for a term exceeding one year; and
>        *Fourth*: before the defendant possessed the firearm, the firearm
> had moved at some time from one state to another or from a foreign
> country to the United States.

Docket No. 92 at 14.  The jury was further informed that the law recognizes both actual

and constructive possession.  *Id.*  With respect to constructive possession, the jury was

instructed that

> [c]onstructive possession occurs when a person who, although not in
> actual possession, knowingly has the power and intent at a given time to
> exercise dominion or control over an object, either directly or through
> another person or persons.
>        More than one person can be in possession of an object if each
> knows of its presence and has the power and intent to control it.
>        In the situation where the object is found in a place (such as a
> room or car) occupied by more than one person, you may not infer power
> and intent to exercise control over the object based solely on joint
> occupancy.  Mere control over the place in which the object is found is not
> sufficient to establish constructive possession.  Instead, in this situation,
> the government must prove some connection between the particular
> defendant and the object demonstrating the power and intent to exercise
> control over the object.

*Id.* 14-15.  Mr. Ramon stipulated to the second, third, and fourth elements of the crime.

*Id.* at 15.

3

### III.  ANALYSIS

Mr. Ramon argues that the evidence adduced at trial was insufficient to show that he had constructive possession of the firearm on or about March 13, 2019.  Docket No. 101 at 1.  Specifically, Mr. Ramon argues that the evidence did not show that he had the intent to exercise control over the firearm around the date in question.  *Id.*

### A.  Evidence From Trial

Taken in the light most favorable to the government, the evidence from trial shows the following.  Probation Officer Jordan Buescher supervised defendant on another matter at the time of the offense.  Trial Transcript at 42.  As part of supervision, individuals are subject to unannounced home visits.  *Id.*  Defendant resided at 810 Everett St., Lakewood, CO with his mother, Lois Ramon, for the entire time Officer Buescher supervised him.  *Id.* at 43-44.  Officer Buescher conducted numerous home visits during his supervision of defendant.  *Id.* at 44.

During unannounced home visits, Officer Buescher would sometimes speak with defendant in the family room for a few minutes, would sometimes contact defendant in the bedroom he used, and would sometimes conduct a full walk-through of all the rooms in the house.  *Id.* at 48-49.  The bedroom doors in the house were always open when Officer Buescher walked through the home.  *Id.* at 49-50.  Office Buescher believed that defendant could access his mother's bedroom if he wanted to.  *Id.*

On March 13, 2019, Officer Buescher conducted a full search of defendant's home with a search team.  *Id.* at 50.  A full search is typically a planned search that involves the United States Probation search team and other law enforcement agencies, as opposed to a normal home visit which usually included only Officer Buescher and his

4

partner. *Id.* The search team arrived at approximately 9:30 a.m.; Officer Buescher and

his supervisor knocked on the door. *Id.* at 51. After several minutes, defendant's

mother answered the door and allowed Officer Buescher and his supervisor into the

home. *Id.* Officer Buescher and his supervisor determined that defendant and Ms.

Ramon were the only persons in the home and then instructed the search team to

begin the search. *Id.* at 51-52. A member of the search team conducted a video walk-

through before the search. *Id.* at 52. During the majority of the search, defendant and

his mother were located in the living room; however, when the search team searched

the living room, defendant and Ms. Ramon were moved to the adjacent family room. *Id.*

at 68-69. Mr. Ramon was in a wheelchair during the majority of the search. *Id.* at 69-

70. Defendant had a prosthetic leg, and the video shows defendant standing at the

very end of the search. *Id.* at 70. Defendant became very upset during the search. *Id.*

at 56, 83. Specifically, the video footage captured the following conversation:

(Mr. Ramon = CR; Lois Ramon = LR; Unknown probation officer = PO):

(unintelligible)
CR - I want to self-revoke right now,
Get the f*** away from (unintelligible)
CR - (unintelligible) Mom, you (unintelligible), Mom;
(unintelligible) f*** you (unintelligible) , you're a f***in punk.
I wanna go to jail, I want to self-revoke right f***in now;
LR - sit down (unintelligible);
CR - you just get the f*** out of our house, take me to jail;
PO - sit down (unintelligible)
CR - no, f*** you;
LR - I am all right, please sit down;
PO - sit down;
CR - you sit down;
LR - please sit down;
PO - sit down;
CR - you sit down, mother f***er';
LR - I am all right. please sit down;

5

They will beat you,
CR - I don't give a f***.
LR - They will beat you like they know how, sit down;
CR - It won't be the first time.
get the f*** out of our house, let's go to jail;
PO - sit down;
CR - f*** you, sit me down.
Mom, move, Mom
LR - please, I asked you to sit down, only for your own safety, sit down;
CR - this is bull****.

GX-18[1].

The search team found a firearm in Ms. Ramon's closet bedroom.  *Id.* at 56, 84.

The firearm – a revolver in a holster – was located on the left-hand side of the closet.

*Id.* at 85-86.  The firearm was located on top of boxes on a shelf and was high up in the

closet; a 5' 10" person could likely reach it if he or she was on his or her "tippy toes."  *Id.*

at 88-89.  The officers used a step stool located by the closet in order to be able to view

the firearm.  *Id.* at 89.

An ATF physical scientist, Marlo McCoy, conducted a forensic examination of the

firearm.  *Id.* at 146.  Ms. McCoy swabbed the firearm on the front sight, the textured

button, the hammer and extractor rod, the textured portion of the trigger, and the

textured portion of the grips in "pre-swabs," which are swabs before the latent print

processing.  *Id.* at 147.  The swabs of the front sight and portions of the barrel were of

portions of the firearm that were covered by the barrel.  *Id.* at 153.  After Ms. McCoy

conducted her "pre-swabs," she gave the firearm to a fingerprint specialist, who

conducted a fingerprint analysis.  *Id.* at 160.  Once the finger print analysis was

---

[1] The transcript of the conversation is as depicted in defendant's Rule 29 motion.
*See* Docket No. 101 at 3-4.

completed, the firearm was returned to Ms. McCoy for more swabbing.  *Id.*  Ms. McCoy took "post-swabs" of the ridge detail (which is indicative of touch) and front and back straps of the frame.  *Id.* at 149, 160.  There was ridge detail on the barrel, the frame, and the front and back straps.  *Id.* at 160.  Ms. McCoy also took "post-swabs" of smooth areas of the firearms and other remaining areas, like the cylinder.  *Id.* at 161.  Ms. McCoy took eight swabs of the firearm.  *Id.* at 158.

An ATF forensic biologist, Toni Diegoli, conducted an examination of the swabs and created DNA profiles based on the swabs.  *Id.* at 171, 186.  Ms. Diegoli determined that there were four locations on the firearm to which defendant was a contributor to the DNA profile.  *Id.* at 200.  Ms. Diegoli performed analysis on the swabs of the grips, including the ridge detail and front and back straps of the frame, and concluded that the DNA profile from the material collected through the swabs was at least 1 trillion times more likely to have originated from defendant than to have originated from an unrelated unknown individual.  *Id.* at 191-92.  This is the highest level of support possible.  *Id.* at 192.  Ms. Diegoli combined the material from the swabs of the front sight, the barrel nearest the front sight, and the textured front sight, which analysis yielded a profile whose major component was 1 trillion times more likely to have originated from defendant as from an unrelated unknown individual.  *Id.* at 192-96.  Ms. Diegoli's analysis of the textured button and hammer produced a DNA profile that was 18.5 million times more likely to have originated from defendant than from an unrelated unknown individual.  *Id.* at 197-98.  Ms. Diegoli's analysis of the swabs from the trigger and trigger guard produced a DNA profile that was 529 million times more likely to have originated from defendant than from an unrelated unknown individual.  *Id.* at 198-99.

The DNA profile Ms. Diegoli developed from the swabs of the cylinder was not suitable for comparison; Ms. Diegoli was unable to develop a DNA profile from the swabs of the ridge detail on the barrel and frame.  *Id.*  at 199-200.

## B.  Sufficiency of the Evidence

The Court finds that, viewed in the light most favorable to the government, a reasonable jury could have found that Mr. Ramon constructively possessed the firearm on or about March 13, 2019.  "[C]onstructive possession requires both the power to control an object *and intent to exercise that control*."  *United States v. Benford*, 875 F.3d 1007, 1016 (10th Cir. 2017) (quoting *United States v. Little*, 829 F.3d 1177, 1182 (10th Cir. 2016)).  The issue before the Court is whether Mr. Ramon had the intent to control the firearm on or about March 13, 2019.

The Court finds *United States v. Samora*, 954 F.3d 1286 (10th Cir. 2020), instructive.[2]  In *Samora*, the defendant was arrested after driving his ex-girlfriend's car;

---

[2] Defendant's reply brief states that, in the cases he cited, which include *Samora*, "the trials were conducted pre-*Henderson*[ *v. United States*, 575 U.S. 622 (2015)] and the appellate review occurred post-*Henderson*.  Thus, two separate analyses are performed.  The first was a sufficiency of the evidence analysis that was done utilizing the pre-*Henderson* legal standards, i.e. without the intent element.  The second analysis was whether the failure to instruct the jury that constructive possession also required proof of an intent to exercise dominion or control over the object at a specific time created a reasonable probability that the outcome would have been different with the correct jury instruction."  Docket No. 106-1 at 2.  However, this is not the case in *Samora*.  *Henderson* was issued in 2015.  In *Little*, issued in 2016, the Tenth Circuit noted that "*Henderson* change[d] the law of constructive possession . . . . [by holding] that constructive possession requires both power to control an object and intent to exercise that control."  829 F.3d at 1182.  The defendant in *Samora* was arrested in 2017, *Samora*, 954 F.3d at 1289, and the trial took place in 2018.  *United States v. Samora*, Case No. 17-cr-00637-JNP, Docket Nos. 75-76 (D. Utah).  The court in *Samora* reviewed the sufficiency of the evidence claim by "applying the law in effect at the time of trial," 954 F.3d at 1290, which, in 2018, was the post-*Henderson* standard.  *See id.* (stating that constructive possession requires both power and intent to exercise

the police found a loaded firearm in the center console of the vehicle.  954 F.3d at

1289.  The court considered it a joint occupancy case, and "[t]hus, the Government was

required to show some nexus between Defendant and the firearm that supports a

'plausible inference that the defendant had knowledge of and access to the weapon or

contraband.'"  *Id.* at 1290-91 (quoting *United States v. Hishaw*, 235 F.3d 565, 571 (10th

Cir. 2000)).  The court found that the "DNA evidence provides the necessary nexus to

link Defendant to the firearm and establish constructive possession."  *Id.* at 1291.  The

court specifically considered whether the DNA could be sufficient given that the date it

was placed on the firearm was unknown:

> In this case, the evidence showed Defendant handled the specific firearm
> at issue, and because Defendant's DNA matched the major profile on the
> firearm, it is reasonable for the jury to infer Defendant handled the firearm
> more recently than two years ago.  While the Government's expert
> testified the DNA evidence was degraded, due in part to passage of time,
> neither party elicited testimony as to how much time must have passed
> since Defendant handled the firearm.  This is a question of fact for the
> jury.

*Id.* at 1292.  The court then held, citing *Benford*, that the DNA evidence "provides a

nexus between Defendant and the firearm."  *Id.*

In addition to the DNA evidence providing a nexus between Mr. Ramon and the

firearm, Mr. Ramon's behavior during the search shows an intent to exercise control.  A

---

dominion and control over a firearm).  Therefore, the Court finds the sufficiency of the
evidence analysis in *Samora* applicable to this case.  The court in *Samora* went on to
reverse and remand the case for a new trial because the jury was not instructed that the
defendant must have intended to exercise control over the firearm in order to convict on
a constructive possession theory.  954 F.3d at 1292, 1296.  In contrast, the jury in Mr.
Ramon's trial was properly instructed on this element.  *See* Docket No. 92 at 14-15.
Accordingly, the Tenth Circuit's conclusion in *Samora*, 954 F.3d at 1293, that "a
reasonable probability exists that, had the jury been instructed on the intent element, it
would not have convicted Defendant," is inapplicable to this case.

reasonable jury could conclude that Mr. Ramon's statements during the search were an attempt by Mr. Ramon to terminate the search.  Mr. Ramon argues that his statements, such as the ones wherein he indicated he would self-revoke his probation, showed no control over the firearm.  However, a reasonable jury could conclude that the statements were an attempt to terminate the search so that the firearm would not be found.  The Court finds that a reasonable jury could have found that Mr. Ramon had the power to control the firearm and intended to exercise control over the firearm on or about March 13, 2019.  *See Samora*, 954 F.3d at 1292 ("The DNA combined with Defendant's proximity to the firearm—as he was the sole occupant of the vehicle on the day the firearm was found in the center console—is sufficient to establish Defendant's constructive possession of the firearm.").

## IV.  CONCLUSION

The Court finds that the evidence is sufficient for a reasonable jury to find that Mr. Ramon constructively possessed the firearm on or about March 13, 2019.  For the foregoing reasons, it is

**ORDERED** that Defendant's Motion for Leave to File Reply in Support of Renewed Motion for Judgment of Acquittal [Docket No. 106] is **GRANTED**.  It is further

**ORDERED** that Defendant's Renewed Motion for Judgment of Acquittal [Docket No. 101] is **DENIED**.


DATED April 8, 2022.

BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge